# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
### CIVIL DIVISION

| | | |
|---|---|---|
| UNDER SEAL | § | |
| | § | |
| Plaintiff | § | **FILED UNDER SEAL** |
| | § | |
| | § | **CIVIL ACTION NO.**_____ |
| | § | |
| | § | **PLAINTIFF'S COMPLAINT** |
| vs. | § | **PURSUANT TO 31 U.S.C.** |
| | § | **§§ 3729-3732, FEDERAL** |
| | § | **FALSE CLAIMS ACT** |
| | § | |
| UNDER SEAL | § | |
| | § | **JURY TRIAL DEMANDED** |
| Defendant | § | |

## QUI TAM PLAINTIFF/RELATOR'S COMPLAINT

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CIVIL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Ex rel.* Michael J. Fisher, and Michael Fisher | § | |
| Individually, | § | CIVIL ACTION NO._____ |
| | § | |
| Plaintiff, | § | FILED UNDER SEAL |
| | § | |
| vs. | § | COMPLAINT |
| | § | (31 U.S.C §§ 3729-3732) |
| Wells Fargo Bank, N.A. | § | (FEDERAL FALSE CLAIMS ACT) |
| | § | |
| Defendant. | § | |
| | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |

## QUI TAM PLAINTIFF/RELATOR MICHAEL J. FISHER'S COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732, FEDERAL FALSE CLAIMS ACT

*Qui tam* Plaintiff/Relator, Michael J. Fisher ("Fisher" or "Relator") brings this action on behalf of the United States of America and himself against Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") pursuant to 31 U.S.C. §§ 3729-3732 ("False Claims Act" or "FCA") to recover all damages, penalties, and other remedies available under the False Claims Act and would show the following:

### I. PARTIES

1.    Relator is a citizen of the United States and a resident of Southlake, Texas. Relator was employed in the area of loan modification contracts from 2008 until early 2012. During that time, Relator served as an assistant to attorneys at law firms in Brea, California, and Southlake, Texas, which assisted clients with obtaining modifications of their residential property mortgage loans from Wells Fargo and other loan servicers or lenders.  He reviewed loan

**Relator's Complaint**                                      **Page 2**

modification contracts for each law firm.  Additionally, he has received and reviewed hundreds of modification contracts from other law firms and companies who assisted borrowers in applying for modifications from multiple servicers including Wells Fargo.

2.       Wells Fargo Bank, N.A. is a national bank with principal places of business in Sioux Falls, South Dakota and San Francisco, California.  Wells Fargo's originates and services residential mortgage loans and offers loan modifications pursuant to the Home Affordable Modification Program ("HAMP").  **https://www.wellsfargo.com/homeassist/loanmodification (last accessed February 15, 2013)**.  Wells Fargo has no registered agent for service of process in New York.  The Secretary of State of New York is an agent for service of process on Wells Fargo pursuant to N.Y. BSC. L. § 304.

## II. JURISDICTION AND VENUE

3.       This matter is within the Court's federal question jurisdiction, as Relator brings this action under 31 U.S.C. § 3730(b)(1).  Venue is proper in the Southern District of New York, where Wells Fargo transacts business, pursuant to the False Claims Act, 31 U.S.C. § 3732(a).  This action seeks remedies on behalf of the United States for Defendant's multiple violations of 31 U.S.C. § 3729.

## III. TRUTH IN LENDING ACT AND REGULATION Z

4.       The federal Truth in Lending Act ("TILA" or "the Act") is contained in Title I of the Consumer Credit Protection Act, as amended, at 15 U.S.C. § 1601 *et seq.*  TILA was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit,

**Relator's Complaint**                                                                 **Page 3**

and to protect the consumer against inaccurate and unfair credit billing and credit card practices."
15 U.S.C. § 1601(a), (b).

5.        15 U.S.C. § 1604 authorizes the Consumer Financial Protection Bureau ("CFPB" or "Bureau")[1] to promulgate regulations to carry out the purposes of the Act, which may contain "additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [the Act], to prevent circumvention or evasion thereof, or to facilitate compliance therewith."  15 U.S.C. § 1604(a).  The Bureau's rulemaking and interpretive authority are thus expansive and entitled to substantial deference.

6.        Regulation Z, 12 C.F.R. 1026.1 *et seq.*, was promulgated by the Board of Governors of the Federal Reserve System ("Board") to implement TILA and other federal consumer protection statutes pursuant to authority granted in several sections, including, primarily, section 105 of TILA, 15 U.S.C. § 1604.  *See* 12 C.F.R. 1026.1(a).[2]

The Act is subdivided into five main sections devoted to:

"General Provisions,"
"Credit Transactions,"
"Credit Advertising and Limits of Credit Card Fees,"
"Credit Billing," and
"Consumer Leases."

---

[1] This rulemaking authority was originally vested in the Board of Governors of the Federal Reserve System ("Board"). Effective July 21, 2011, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretative authority from the Board to the new Consumer Financial Protection Bureau ("CFPB" or "Bureau"). Dodd-Frank § 1100A.
[2] Since Dodd-Frank, P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretative authority from the Board to the new CFPB effective July 21, 2011, Dodd-Frank § 1100A, Regulation Z, previously published at 12 C.F.R. 226, has been republished at 12 C.F.R 1026.

**Relator's Complaint**                                                         **Page 4**

The provisions relevant to this action are contained in the first two sections of TILA.

7.      The scope of the Act is so broad that TILA does not contain a general statement of what transactions are covered, but instead specifies what transactions are <u>excluded from coverage.</u>  *See* 15 U.S.C. § 1603, titled "Exempted transactions."  The Court of Appeals for the Fifth Circuit has held that "'exceptions' not mentioned in the Act should not lightly be read into it."  *Thomas v. Myers-Dickson Furniture Co.*, 479 F.2d 740, 745 (5th Cir. 1973).  The Act also affirmatively specifies coverage as to some transactions, including, *inter alia*, exceptions to exceptions from coverage.   Although the original bill passed by the Senate did not cover mortgage lending, the final version of the Act passed by Congress included all real property transactions, unless specifically exempted.  4-37A Powell on Real Property § 37A.01[1][a].

A.     **TILA Definitions and Notice of Right to Rescind**

8.      The Act delineates its broad scope by specifying *who* must comply with its provisions.   Specifically, TILA provides that "creditors" are required to comply and provides that **"Creditor"**

> refers only to **a person who both (1) regularly extends, whether in connection with loans,** sales of property or services, or otherwise, **consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge**[3] **is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness** or, if there is no such evidence of indebtedness, by agreement. . . . Any person who originates 2 or more mortgages referred to in subsection (aa) [current subsection (bb)][4] in any 12-

---

[3] Regulation Z defines "finance charge" at 12 C.F.R. § 1026.4.
[4] A "mortgage[ ] referred to in Subsection (aa) [current subsection (bb)]" refers to certain high-cost mortgages; the phrase:

> means a consumer credit transaction that is secured by the consumer's principal

dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if--

(A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

(B) the total points and fees payable by the consumer at or before closing will exceed the greater of--

(i) 8 percent of the total loan amount; or
(ii) $400.

15 U.S.C. § 1602(bb)(1).  The 8% figure may be and the $400 figure is required to be adjusted regularly by the Bureau.  15 U.S.C. 1602(bb)(2), (3).   Fees and points include:

(A) all items included in the finance charge, except interest or the time-price differential;
(B) all compensation paid to mortgage brokers;
(C) each of the charges listed in section 106(e) [15 U.S.C. § 1605(e)] (except an escrow for future payment of taxes), unless--

(i) the charge is reasonable;
(ii) the creditor receives no direct or indirect compensation; and
(iii) the charge is paid to a third party unaffiliated with the creditor; and
(D) such other charges as the Bureau determines to be appropriate.

15 U.S.C. § 1602(4).  A "residential mortgage transaction" is, in general, a purchase money loan or construction loan for the initial acquisition of the borrower's dwelling.  15 U.S.C. § 1602(x).

(w) The term "dwelling" means a residential structure or mobile home which contains one to four family housing units, or individual units of condominiums or cooperatives.

(x) The term "residential mortgage transaction" means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling.

15 U.S.C. § 1602; see also 12 C.F.R § 1026.2(a)(19), (24).  "Residential mortgage loan" however, differs in some respects from a "residential mortgage transaction" and is not limited to an initial construction or acquisition loan:

**Relator's Complaint**                                            **Page 6**

month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this title . . . .

15 U.S.C. § 1602(g).  Under the Act,

> (f) The term **"credit"** means **the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment**.

15 U.S.C. § 1602(f).

    9.    TILA requires creditors to make specific disclosures for, *inter alia*, **"closed-end credit,"** which is defined as credit **other than "open-end credit,"** which includes primarily revolving credit or charge accounts and lines of credit without a specific end date.

> (j) The terms "open end credit plan" and "open end consumer credit plan" mean a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance. A credit plan or open end consumer credit plan which is an open end credit plan or open end consumer credit plan within the meaning of the preceding sentence is an open end credit plan or open end consumer credit plan even if credit information is verified from time to time.

15 U.S.C. § 1602(j).

    10.    Section 1635 of the Act requires disclosure of the borrower's right to rescind consumer credit transactions in which a security interest is retained or acquired in property that will be the borrower's principal dwelling until midnight of the third business day after

---

> (5) Residential mortgage loan. The term "residential mortgage loan" means any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling, other than a consumer credit transaction under an open end credit plan or, for purposes of sections 129B and 129C [15 USCS §§ 1639b and 1639c], sections 128(a) (16), (17), (18), and (19) [15 USCS § 1638(a)(16)-(19)], sections 128(k) [15 USCS §§ 1638(f) and 1640(k)], and any regulations promulgated thereunder, an extension of credit relating to a plan described in section 101(53D) of title 11, United States Code.

15 U.S.C. § 1602[(dd)] (cc).

Relator's Complaint

consummation of the transaction or delivery of the TILA disclosures and rescission forms, whichever is later.  12 U.S.C. § 1635(a).  Written acknowledgement of *any* required TILA disclosure creates only a rebuttable presumption of delivery.  15 U.S.C. § 1635(c).  Refinancings *with no new advances, by the same creditor and secured by the same property*, and certain other transactions are exempted from the rescission provisions.  15 U.S.C. § 1635(e).

11.    Knowing and willful violations of the Act are subject to criminal penalties including fines and imprisonment.  15 U.S.C. § 1611.

**B.    Regulation Z Definitions, Disclosure Requirements, and Commentary Guidance**

12.    Regulation Z specifies that its scope extends in general to creditors:

To each individual or business that offers or extends credit . . . when four conditions are met:

(i)     The credit is offered or extended to consumers;
(ii)    The offering or extension of credit is done regularly; . . .
(iii)   The credit is subject to a finance charge or is payable by a written agreement in more than four installments; and
(iv)    The credit is primarily for personal, family, or household purposes.

12 C.F.R. 1026.1(c)(1).

13.    Regulation Z provides five independent tests for determining whether one is a **"Creditor,"** including in relevant part:

(17) Creditor means:

**(i) A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract,** or by agreement when there is no note or contract.
. . .

Relator's Complaint                                                      Page 8

(v) **A person regularly extends consumer credit only if it extended credit** (other than credit subject to the requirements of § 1026.32) more than 25 times (or **more than 5 times for transactions secured by a dwelling) in the preceding calendar year.** If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 1026.32 or one or more such credit extensions through a mortgage broker.

12 C.F.R. 1026.2(a)(17).  If the obligation is initially payable to one person, that person is the creditor.  12 C.F.R. § 1026, Supp. I, Comment 2(a)(17)(i)2.

14.    **Credit** means the right to defer payment of debt or to incur debt and defer its payment.  12 C.F.R. 1026.2(a)(14).

15.    "**Consumer credit** means credit offered or extended to a consumer primarily for personal, family, or household purposes."  12 C.F.R. 1026.2(a)(12).

16.    **Consummation** means the time that a consumer becomes contractually obligated on a credit transaction.  12 C.F.R. 1026.2(a)(13).

17.    Regulation Z specifies that a "**residential mortgage transaction**"

means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained in the consumer's principal dwelling to finance the acquisition or initial construction of that dwelling.

12 C.F.R. 1026.2(a)(24).  According to the Commentary to the § 1026.2(a)(24) definition of "[r]esidential mortgage transaction," a transaction is not "to finance the acquisition" of the consumer's principal dwelling if the consumer has previously purchased and acquired some title to the dwelling, even if not full legal title.  12 C.F.R. § 1026, Supp. I, Comment 2(a)(24)5.

18.     Regulation Z defines **closed-end credit** in the same manner as the Act—credit other than open-end credit, 12 C.F.R. § 1026.2(a)(10), and defines **"open-end credit"** as "consumer credit extended by a creditor under a plan in which: (i) [t]he creditor reasonably contemplates repeated transactions; (ii) [t]he creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) [t]he amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. § 1026.2(a)(20).

19.     Closed-end credit disclosures are governed by Regulation Z's Subpart C, 12 C.F.R. §§ 1026.17-1026.24. New disclosures are expressly required by Regulation Z on all closed-end credit transactions upon the occurrence of a refinancing or assumption. 12 C.F.R. § 1026.20. A refinancing, requiring new disclosures, occurs when the original obligation is satisfied or extinguished and replaced. 12 C.F.R. § 1026.20, & Supp. I, Comment 1026.20(a)-1. When this occurs, new disclosures are required even if the prior credit terms were not substantially altered. *Id.* Regulation Z specifies that some transactions that might otherwise be considered refinancings are "not treated as a refinancing," including:

(1) a renewal of a single payment obligation with no change in the original terms;

(2) a reduction in the annual percentage rate with a corresponding change in the payment schedule;

(3) an agreement involving a court proceeding;

**(4) a change in the payment schedule or a change in collateral requirements as a result of the consumer's default or delinquency, unless** the rate is increased, or **the new amount financed exceeds the unpaid balance plus earned finance charge and premiums for continuation of insurance of the types described in § 1026.4(d)**; and

(5) the renewal of optional insurance purchased by the consumer and added to an existing transaction, if disclosures relating to the initial purchase were provided as required by this subpart.

12 C.F.R. § 1026.20(a)(1)-(5).  Caselaw addressing the first, second, and fourth exceptions often refer to such transactions as "mere modifications."

20.     In some credit transactions in which a security interest is acquired in a consumer's principal dwelling, other than "residential mortgage transactions," each consumer whose ownership interest is or will be subject to a security interest has a right to rescind the transaction. 15 U.S.C. § 1635; 12 C.F.R. § 1026.23(a) ("residential mortgage transaction" is defined at 12 C.F.R. § 1026.2(a)(24) as a transaction to finance the initial acquisition or construction of a dwelling, whether the dwelling is real or personal property).   12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-1; *see also* 122 C.F.R. 1026, Supp. I, Comment 1026.23(a)).  Refinancing or consolidation by the same creditor of an extension of credit already secured by the consumer's principal dwelling is exempt from the right to rescind.  *See Arnold v. W.D.L. Investments, Inc.,* 703 F.2d 848 (5th Cir. 1983).  This exemption, in Section 1026.23(f)(2), applies only to a refinancing or a consolidation by the original creditor; if new money is advanced, however, the amount of the new money is rescindable.  For purposes of rescission, a new advance does not include amounts attributed solely to the costs of refinancing.  12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-4.

21.     In any transaction subject to rescission, the creditor must give the consumer two copies of a notice of right to rescind, which must be a separate document clearly and conspicuously disclosing the rights and process of rescission.  12 C.F.R. § 1026.23(b).  Unless the consumer waives the right to rescind, permitted only in limited circumstances, no money

**Relator's Complaint**                                                    **Page 11**

shall be disbursed, other than in escrow, no services shall be performed and no materials shall be delivered unless and until the three-day period passes without the right of rescission being exercised. 12 C.F.R. § 1026.23(c).

22.    Federal law dictates that in a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership is or will be subject to the security interest has the right to rescind the transaction. <u>Lenders are required to deliver two copies of the notice of the right to rescind to each consumer entitled to rescind</u>. The notice must be on a separate document that identifies the rescission period on the transaction, and must <u>clearly and conspicuously disclose</u> the retention or acquisition of a security interest in the consumer's principal dwelling; the consumer's right to rescind the transaction; and how the consumer may exercise the right to rescind with a form for that purpose, designating the address of the lender's place of business. *See* **12 C.F.R. § 1026.23, attached hereto as Exhibit 9**.

### IV. HOME AFFORDABLE MODIFICATION PROGRAM

23.    In approximately mid-to late 2008, an industry sprung up to help financially troubled homeowners save their homes by negotiating loan modifications with the servicers[5] of the loans. In the third quarter of 2009, the U.S. Treasury Department rolled out HAMP[6] to

---

[5] A loan servicer need not be a bank but may be. It is an entity that may or may not be the original lender or the owner of a loan. Servicers that are not the owners are paid to collect monthly payments and generally manage the borrowers' accounts on a day-to-day basis on behalf of the owners of the loans. Servicers sometimes buy the right to service groups of loans.

[6] In addition to the Treasury Department's HAMP program for non-GSE loans—loans not owned by Government-Sponsored Entities ("GSEs"), such as the Federal National Mortgage Association (Fannie Mae), or Federal Home Loan Mortgage Corporation (Freddie Mac)--Fannie Mae, Freddie Mac, the VA, and the FHA administer their own versions of HAMP pursuant to the

**Relator's Complaint**                                                **Page 12**

encourage lenders to modify home-secured loans.  Under HAMP, loan servicers, investor/owners of loans, and borrowers receive incentive payments from the Government in connection with granting the modification and keeping the modified payments current (the borrower's incentives are paid to the servicer to be applied as principal reduction and paid to the owner/investor on behalf of the borrower).  On August 19, 2010, pursuant to its Supplemental Directive 10-09, **Exhibit 1**, the Treasury Department issued the Making Home Affordable Program Handbook for Servicers of non-GSE mortgages[7] ("MHA Handbook"), which governs the procedures for HAMP loan modifications.

24.     The MHA Handbook states "[t]his Handbook constitutes Program Documentation under the Servicer Participation Agreement and is incorporated by reference into the Servicer Participation Agreement."  **Exhibit 4, *MHA Handbook v. 3.4*, at p. 12**.  The Servicer Participation Agreement is part of the uniform agreement between a servicer and the Government's financial agent Fannie Mae as designated by the Treasury Department ("Commitment to Purchase Financial Instrument and Servicer Participation Agreement"), pursuant to which the servicer may participate in HAMP, 2MP (Treasury and HUD's Second Lien Modification Program), Treasury FHA-HAMP, RD-HAMP (Department of Agriculture's Rural Housing Service HAMP program), or FHA2LP (FHA refinance program for underwater loans) for loans that are not owned, securitized, or guaranteed by Fannie Mae or Freddie Mac, and the Government compensates the servicer, loan owner(s), and borrower(s). The form of the Servicer Participation Agreement can be accessed at:

---

Government's Making Home Affordable initiative.
[7] Non-GSE mortgages are mortgages not owned by GSEs such as Fannie Mae or Freddie Mac.

https://www.hmpadmin.com//portal/programs/servicer.jsp (last accessed February 15, 2013).  All servicer participant agreements were executed by December 31, 2009, after which time no additional servicers could participate.

25.     Under HAMP, the incentive fees have varied over time.   However, since the damages in a fraudulent inducement of the United States by this Defendant entitle the United States to recover all the funds paid under the program by virtue of this Defendant's conduct, it is the total incentives that constitute the actual damages under the false Claims Act.   Nonetheless, for purposes of providing some detail, incentive payments  paid to the servicer by the Government **before** October 1, 2011, could have equaled up to $4,500 ($1,000 + $500 + $3,000) per HAMP modification of a non-delinquent borrower's debt, and similar fees were also paid by the Government to (1) the lender/investor owners of the loans and (2) the servicer on behalf of the borrowers with the proceeds paid, reducing the borrower's loan principal balance, to the investor/owner of the loan.

26.     In the MHA Handbook v. 3.4, (December 15, 2011), every servicer is put on notice of the following requirement:

**1.6 Compliance with Applicable Laws**

Each servicer and any sub-servicer that the servicer uses will be subject to and must fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions including, but not limited to, the following laws that apply to any of its practices related to MHA.

**Exhibit 4,** *MHA Handbook v. 3.4*, at p. 25 ¶ 1.6.

27.     Pursuant to the HAMP servicer Compensation Schedule, *a servicer received: (1)* a one-time payment of $1,000 for modifications completed before October 1, 2011; and (2) a

**Relator's Complaint**                                                    **Page 14**

one-time payment of $400-$1,600 for modifications completed on or after October 1, 2011 from the Government for each completed permanent HAMP modification for which the borrower was delinquent at the time of the modification; this amount depended on the effective date of the trial period plan and the number of days the loan had been delinquent.  For permanent HAMP modifications with a trial period plan effective date before 10/1/2011, the servicer receives an additional **$500** for each permanent HAMP loan modification for which the borrower was not delinquent at the time of the permanent modification (this bonus payment is no longer applicable for modifications with a later trial period plan effective date) for a maximum one-time payment before October 1, 2011 of $1,500.  **Exhibit 3, *MHA Compensation Matrix*, at p. 1, §§ 1-2,** http://hmpadmin.com/portal/programs/docs/hamp_servicer/mhacompensationmatrix.pdf    **(last accessed February 21, 2013); Exhibit 4, *MHA Handbook v. 3.4*, at pp. 105-106 ¶ 13-13.1.1**.

28.    In addition, ***servicers are paid up to*** $83.33 per month, which is accrued monthly and paid annually on the anniversary date of the permanent HAMP loan modification for a period of thirty-six (36) months for modified loans that remain in good standing (if the borrower defaults at any time within the twelve month period of any year, the servicer still receives $83.33 for each month the loan was in good standing).  Thus, servicers, **before** October 1, 2011, could have been paid **up to $4,000** for a permanent HAMP loan modification where the borrower was delinquent at the time of modification ($1,000 for modification plus $3,000 maximum total good standing payments over 36 months) and continued in good standing for thirty-six (36) consecutive months, and **up to $4,500** for a permanent HAMP loan modification where the borrower was not delinquent at the time of modification and continued in good standing for thirty-six (36) consecutive months ($1,000 + $500 for modification, plus $3,000 maximum total

**Relator's Complaint**                                                                            **Page 15**

good standing payments).  **After** October 1, 2011, servicers were paid up to a flat $1,600 for a permanent HAMP modification of a borrower **less** than 120 days delinquent and as little as $400 if the borrower was delinquent **more** than 210 days. **Exhibit 3, *MHA Compensation Matrix*, at p. 3, § 6; Exhibit 4, *MHA Handbook v. 3.4*, at pp. 105-107 ¶ 13-13.1.3.**

29.     The United States also paid *up to* $83.33 per month **for the benefit of borrowers**, to be applied to the borrower's loan balance as principal reduction, accruing monthly and paid annually for the **first five years** as long as the loan is in good standing, where the modification reduced the monthly housing expense by 6% or more and the property was owner occupied. These payments are made by the Government to the servicer for the benefit of the borrower, which applies the payment against the borrower's principal balance by payment of the funds to the investor/owner of the loan.  **Exhibit 3, *MHA Compensation Matrix*, at p. 2, §5; Exhibit 4, *MHA Handbook v. 3.4*, at p. 107 ¶ 13.2.**  Thus the United States pays for the benefit of the borrower (and the owner of the loan, which receives the financial benefit of the payment on the loan) **up to** a maximum of $5,000.

30.     Owner/Investors of the loans were paid a one-time modification fee of $1,500 for modifications that lowered the monthly housing expense by 6% or more so long as the property was owner occupied.  Investors are paid by the United States (via payment to the servicer for the investor) good standing incentives accruing monthly and paid annually for up to five years pursuant to more complex formulas.  Investors can also receive Investor Home Price Decline (HPDP) Incentive Payments for two years or Principal Reduction Alternative Payments for up to three years, pursuant to similar formulas based in part on the decrease in value or the amount of principal reduced. **Exhibit 4, *MHA Handbook v. 3.4*, at pp. 107-110 ¶ 13.3-13.3.4.2 (formulas**

for investor incentives); **Exhibit 3,** *MHA Compensation Matrix,* **at pp. 2-4, §§ 3, 4, 7, 8.** Again, the complexity of the payment regime doesn't affect the damages owed by Defendant Wells Fargo to the United States on the fraudulent inducement liability.  It is the total HAMP incentives paid by the United States to Wells Fargo as a result of Wells Fargo's fraudulent inducement of the U.S.'s approval of the Servicer Participation Agreement by way of material false representations, certifications and omissions of material facts that continue through this date.   If any of such claims were released by the Settlement by Wells Fargo with the United States on February 8, 2012, the post-settlement incentive payments of **$346,394,880.28,** rather than the grand total of **$690,322,157.87,** constitute the single damages figure under the False Claims Act.

## V. FACTS

31.     Michael J. Heid, Executive Vice President of Wells Fargo, executed on behalf of Wells Fargo on March 16, 2010, an Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement ("Wells Fargo Servicer Participation Agreement") with Fannie Mae as financial agent for the United States (accepted by Fannie Mae on March 19, 2010).  **Exhibit 6,** *Wells Fargo Servicer Participation Agreement.*  Wells Fargo continues as a HAMP participant.  **Exhibit 2,** *Non-GSE Servicer Participants.*

32.     This March 16, 2010 agreement references a prior agreement that is being amended and restated, but the date of that prior agreement is not clear from the March 16, 2010 agreement.  **Exhibit 6,** *Wells Fargo Servicer Participation Agreement,* **at pp. 1, 2, 13.**  The Treasury Department Office of Financial Stability Troubled Asset Relief Program ("TARP") Transactions Reports indicate an initial date of 4/13/2009.  See **Exhibit 7, U.S.** *Treasury*

*Department Office of Financial Stability, Troubled Asset Relief Program, Transactions Report-Housing Programs for Period Ending February 14, 2013, Making Home Affordable Program*, at p.2,

http://www.treasury.gov/initiatives/financial-stability/reports/Pages/default.aspx ,

under, "All Reports by Frequency," "As Indicated," click on "TARP Housing Transaction Reports" and select report by date (last accessed February 20, 2013).

      33.    Wells Fargo's Servicer Participation Agreement, **Exhibit 6,** provides for representations, warranties, and certifications by Wells Fargo, the Servicer, both within the Servicer Participation Agreement itself and in subsequent annual certifications:

> **C. Servicer's representations and warranties, and acknowledgement** of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Programs and under the Agreement **are set forth in the Financial Instrument.** Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit C (the "Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below) and upon the execution and delivery by Servicer of any Additional Service Schedule during the Term.

**Exhibit 6,** *Wells Fargo Servicer Participation Agreement,* at p. 2 ¶ 1.C.

      34.    In the Financial Instrument's Representations, Warranties and Covenants section, Wells Fargo represented, warranted, and covenanted that:

(b)    Servicer **is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq.** [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence,

Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement. **Exhibit 6, *Wells Fargo Servicer Participation Agreement*, at p. B-3 ¶ 5(b), executed by Wells Fargo at p. B-7.**

35.    The following statements are included in the Certificate that is to be executed and delivered to the Government by Wells Fargo annually beginning on June 1, 2010, and again on June 1 of each year during the Term of the Agreement, pursuant to paragraph 1.C of Wells Fargo's Servicer Participation Agreement, as well as paragraph 5(l) of the Financial Instrument, which is incorporated in and part of the Servicer Participation Agreement.  **Exhibit 6, *Wells Fargo Servicer Participation Agreement*, at pp. 2 ¶ 1.C., 13 ¶ 12.D. (incorporation by reference) & B-4 -- B5 ¶ 5(l):**

**CERTIFICATION**

2.    <u>Servicer is in compliance with</u>, and <u>certifies</u> that all Services have been <u>performed</u> in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, <u>the Truth in Lending Act, 15 USC 1601 § et seq.</u>, the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights.

**Exhibit 6, *Wells Fargo Servicer Participation Agreement*, at p. C-1 ¶ 2; *see also* Exhibit 8, *Form for Annual Certification*, accessible at**

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicerparticipationagreemen t.pdf **(last accessed February 15, 2013)**.

36.     Wells Fargo falsely certified its full compliance with the Truth in Lending Act and Regulation Z initially with the execution of the Servicer Participation Agreement and the Certification within that Agreement, on March 16, 2010, as well as in its original agreement on or about April 13, 2009, which pursuant to the HAMP program was substantially similar, and in each annual re-certification.

## A.     MATERIALITY OF WELLS FARGO'S CERTIFICATIONS

37.     The certifications made by Wells Fargo were material to payment by the United States.  Paragraphs 4.A. to 4.D. of Wells Fargo's Servicer Participation Agreement provide as follows:

> **4.     Agreement to Purchase Financial Instrument; Payment of Purchase Price**
>
> **A.     Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase,** and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as <u>Exhibit B</u>, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price.
>
> **B.     The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Initial Service Schedules are: (a) the execution and delivery of the Commitment, the Initial Service Schedules, and the Financial Instrument by Servicer to Fannie Mae;** (b) the execution and delivery of the Commitment and the Initial Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Commitment, Initial Service Schedules and Financial Instrument to Treasury on the Effective Date of the Agreement; **(d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.**

C.     The conditions precedent to the payment by Fannie Mae of the Purchase Price with respect to the Services described on the Additional Service Schedules (if any) are: (a) the execution and delivery of the Additional Service Schedules and the Certification by Servicer to Fannie Mae; (b) the execution and delivery of the Additional Service Schedules by Fannie Mae to Servicer; (c) the delivery of copies of the fully executed Additional Service Schedules to Treasury; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

D.     Solely in its capacity as the financial agent of the United States, and subject to subsection E. below, Fannie Mae shall remit all payments described in the Program Documentation to Servicer for the account or credit of Servicer, Investors and borrowers, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit or account of third parties under the Program Documentation shall be applied by Servicer as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the applicable Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

**Exhibit 6,** *Wells Fargo Servicer Participation Agreement,* **at p. 3-4**.

38.     Wells Fargo acknowledged in the **Financial Instrument** purchased by Fannie Mae pursuant to the Commitment to Purchase Financial Instrument and Servicer Participation Agreement between Fannie Mae and Wells Fargo that providing false or misleading information to Fannie Mae or Freddie Mac in the HAMP Program may constitute violations of (1) federal criminal laws found in Title 18 of the U.S. Code, or of the civil False Claims Act (31 U.S.C. §§ 3729-373):

Relator's Complaint                                                                         Page 21

    (f)      **Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with any of the Programs or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud,** conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or **(b) the civil False Claims Act (31 U.S.C. §§ 3729-3733).** Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

Exhibit 6, *Wells Fargo Servicer Participation Agreement*, at p. B-4 ¶ 5(f).  Given the scope of the representations, warranties, and covenants and the Servicer's continuing obligations of truthfulness and accuracy as set forth in the introduction to paragraph 5, Wells Fargo was on notice of the obligations of truthfulness and accuracy and acknowledged that failures to fulfill these obligations could lead to criminal and False Claims Act prosecution:

    **5. <u>Representations, Warranties and Covenants</u>**.  Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. **In the event that any of the representations, warranties, or covenants made herein ceases to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.**

Exhibit 6, *Wells Fargo Servicer Participation Agreement*, at p. B-2 ¶ 5.

    39.    In 2008, Relator, who was an employee of a Brea, California, law firm, began assisting attorneys there in assisting homeowners in obtaining home loan modifications.  Relator continued this work with a Southlake, Texas law firm beginning in April, 2011 upon moving to Texas in November of 2010.  He continued to assist the California law firm while working at the Texas law firm until March, 2012.  Relator's tasks included primary responsibility for much of the processing of loan modification applications for the firms' clients.  Relator assisted a number of attorneys in successfully completing hundreds of loan modifications for clients of the two law

Relator's Complaint                                                   **Page 22**

firms and personally reviewed every one of the modification contracts and applications. Relator coordinated the modification process with twenty or more different servicers. Additionally, he has received and reviewed hundreds of modification contracts from other law firms and companies who represented clients for modifications from multiple servicers including Wells Fargo.

40.     Relator worked with his law firm employers to complete successful Wells Fargo loan modifications for the firms' clients. Relator reviewed and consulted on the details of each Wells Fargo modification agreement with the clients. As a result, Relator is completely aware of all of the Wells Fargo modification agreements between the firms' clients and Wells Fargo, as well as the contents of the files. This includes some modifications submitted under HAMP and non-HAMP modifications. Relator has also requested and received copies of a number of Wells Fargo HAMP and non-HAMP modification contracts from other firms and has closely examined them all.

41.     Wells Fargo's HAMP and non-HAMP modification contracts are similar in form and substance, although HAMP loans must meet the HAMP requirements for approval and non-HAMP approval terms may be more flexible.

42.     In the numerous HAMP and non-HAMP Wells Fargo loan modifications reviewed by Relator, Wells Fargo virtually always loaned new amounts of principal to the borrower by adding the new debt to the original loan principal balance. The amount of the new, additional loan advances made to these borrowers, above and beyond the principal balance, on the contracts reflected an approximate average of $31,900 per HAMP and non-HAMP modifications. Usually, when the newly advanced amount was specified in a modification

**Relator's Complaint**                                              **Page 23**

contract that amount included delinquent interest, property tax loans, and various fees and costs of Wells Fargo. Attached as **Exhibit 5** are exemplar copies of a typical Wells Fargo HAMP and non-HAMP modification contracts. On the new amounts added to the principal balance under a security agreement on the dwelling, Wells Fargo charged interest to be repaid, generally, as long as the next twenty-five years. **Wells Fargo does not, however, provide Notice of the Right of Rescission to the borrower(s) as expressly required by Section 1026.23 of Regulation Z,** despite the fact that Wells Fargo's sophisticated real-estate lending lawyers prepared each of the files.

43. To date, the United States has paid more than **$690,322,157.87** in HAMP incentives as a result of Wells Fargo's false statements, records, and claims for payment, including **$222,034,375.82** for the sole benefit of Wells Fargo, the servicer. The balance of the funds was paid directly to the investors and a portion was paid on behalf of the borrowers to the investor. **See Exhibit 7, U.S. *Treasury Department Office of Financial Stability, Troubled Asset Relief Program, Transactions Report-Housing Programs for Period Ending February 14, 2013, Making Home Affordable Program*, at p.31, Supplemental Information [Not Required by EESA §114(a)], Making Home Affordable Program, Non-GSE Incentive Payments (through January 2013).** http://www.treasury.gov/initiatives/financial-stability/reports/Pages/default.aspx , under "All Reports by Frequency," "As Indicated," click on "TARP Housing Transaction Reports" and select report by date (last accessed February 20, 2013). The cap on incentives for Wells Fargo modifications, which is subject to periodic adjustments, is **$5,111,136,632** in potential incentive payments by the United States. **See Exhibit 7, *U.S. Treasury Department***

*Office of Financial Stability, Troubled Asset Relief Program, Transactions Report-Housing Programs for Period Ending February, 2013, Making Home Affordable Program*, at p. 3,.

44.     The procedure by which Wells Fargo has received the Government-paid incentives for Wells Fargo's loan modifications is as follows:

### MHA Compensation Process

1.     Servicer establishes bank account.

   - Bank accounts are designated by the servicer on the HAMP Registration Form, Sections 3 and 4.

   - Servicers may designate up to four accounts to allocate compensation appropriately: default, servicer, investor, and borrower accounts.

2.     Servicer submits Official Loan Setup record once trial period is complete.

   - Refer to the chart above for compensation timing considerations and requirements.

3.     Fannie Mae, as administrator for the Making Home Affordable Program, provides Cash Payment Summary Report to servicer.

   - Report includes compensation amount on a loan-level basis and indicates the associated payor: U.S. Treasury Department, Fannie Mae, or Freddie Mac.

     Report is accessible via the HAMP Reporting Tool one business day before compensation is deposited into accounts. Deposit occurs on the 27th calendar day or first business day prior to the 27th if the 27th falls on a weekend or a holiday.

4.     Deposit is made.

   - Deposit is transferred via the Automated Clearing House (ACH) Network on 27th of the month or on the business day prior to the 27th.

**Exhibit 3,** *MHA Compensation Matrix***, at p.** 7.  Wells Fargo has followed this procedure and generated more than $690,322,157.87 in Government incentive payments for the benefit of Wells Fargo, its investor/owners, and its borrowers.

## VI. FALSE CLAIMS ACT

45.   This is an action alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729-32 and seeking damages, based upon a minimum of $346,394,880.28 to $690,322,157 as the single damages figure, as well as civil penalties on behalf of the United States and Relator as a result of the Defendant's false records, statements, and claims.

46.   The False Claims Act generally provides, *inter alia*, that any person who knowingly presents or causes to be presented to the United States for payment or approval a false or fraudulent claim, knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim, or conspires to do these things, is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim.  31 U.S.C. §§ 3729(a)(1).

47.   The False Claims Act allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730(d).  Relator claims entitlement to a portion of any recovery obtained by the United States as he is, on information and belief, the first to file, and is an original source for the information on which the allegations or transactions in the claims herein are based.

Relator's Complaint                                                          Page 26

48.     Based on these provisions, Relator on behalf of the United States Government seeks through this action to recover damages and civil penalties arising from the Defendant's submission of false and/or fraudulent claims for approval and/or payment and Wells Fargo's use of false records or statements that would be material to a decision of the United States to pay Wells Fargo's requests under its contract.  The United States has suffered significant actual damages as a result of the Defendant's false and fraudulent claims, and its use of false records or statements material to false or fraudulent claims.

49.     As required under the False Claims Act, Relator has provided the offices of the Attorney General of the United States and the United States Attorney for the Southern District of New York a disclosure statement of material evidence and information related to and supporting the allegations in this complaint.

50.     Wells Fargo falsely certified on March 16, 2010 that it was in full compliance with all relevant laws, including but not limited to the Truth in Lending Act and Regulation Z, with the execution of the Amended and Restated Servicer Participation Agreement and Financial Instrument, just as it did in its original Servicer Participation Agreement on or about April 13, 2009.   By these material false statements and records, Wells Fargo fraudulently induced the United States, through its Financial Agent Fannie Mae, to enter the Agreements with Wells Fargo and to purchase the overarching Financial Instrument(s).  Wells Fargo made false Subsequent Certifications to the United States annually, on or about June 1, 2010, 2011, and 2012, in the form set forth in the Servicer Participation Agreement, that it had and would comply with all federal, State, and local laws, including specifically, TILA.  Wells Fargo has, however, knowingly, as defined by the False Claims Act, failed to provide TILA/Regulation Z Notices of the Right of Rescission and the Form documents to HAMP and non-HAMP borrowers.

## VII. CAUSES OF ACTION

### First Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(A)

51.     Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs numbered 1 through 50 of this complaint.  Therefore, Wells Fargo has knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of **31 U.S.C. 3729(a)(1)(A)**.  The United States is thus entitled to all relief available under the False Claims Act based upon single, actual damages of not less than $346,394.880.28 to the United States.

### Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)

52.     Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs numbered 1 through 51 of this complaint.  Therefore, Wells Fargo has knowingly made, used, or caused to be made or used a false record or statement, including the omission of material facts, material to a false or fraudulent claims submitted to the United States in violation of **31 U.S.C. § 3729(a)(1)(B)**.  The United States is thus entitled to all relief available under the False Claims Act based upon single, actual damages of not less than $346,394.880.28 to the United States.

## VII. RELIEF

53.     On behalf of the United States, Relator seeks to recover all relief available under the False Claims Act, as amended.  He seeks monetary damages equal to three (3) times the actual damages suffered (based upon not less than **$346,394,880.28** as single damages) by the United States.  In addition, Relator seeks to recover all civil penalties and other relief on behalf of the United States Government and the Relator in accordance with the False Claims Act.

Relator's Complaint                                                    **Page 28**

54.     Relator should, for his contribution to the Government's investigation and recovery, be awarded a fair and reasonable Relator's share pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

55.     Relator seeks to be awarded all costs and expenses for this action, including statutory attorneys' fees, expenses, court costs, and any available pre-judgment or post-judgment interest at the highest rate allowed by law.

## VIII. PRAYER

WHEREFORE, premises considered, Relator prays that this District Court enter judgment on behalf of the United States and against the Defendants for the following:

a.     damages in the amount of three (3) times the actual damages suffered by the United States and all statutory penalties arising from the Defendant's unlawful conduct which violated the False Claims Act;

b.     a Relator's Share from the recoveries in a statutory amount which is fair and reasonable under the circumstances;

c.     Relator's statutory attorneys' fees, expenses and costs of court;

d.     pre-judgment and post-judgment interest, at the highest rate allowed by law; and

e.     all other relief to which Relator and/or the United States may be justly entitled, whether at law or inequity, and which the District Court deems just and proper.

Dated: March 5, 2013

Relator's Complaint                                                   **Page 29**

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher**

Respectfully submitted:

By:/s/ Samuel Boyd
Samuel L. Boyd
SBN: 02777500
Catherine C. Jobe
SBN: 10668280
Boyd & Associates
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile (214) 363-6856
E-mail: sboyd@boydfirm.com

**Lead Counsel for Relator/Qui Tam Plaintiff**

By: _____
Stephen A. Weiss
SEEGER WEISS LLP
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
E-mail: sweiss@seegerweiss.com

**Local Counsel for Relator/Qui Tam Plaintiff**

## CERTIFICATE OF SERVICE AND DISCLOSURE

On March 1, 2013, Relator served a copy of his Disclosure Statement to US Attorneys Preet Bharara, Pierre Armand and Daniel Filor for the United States District Court for the Southern District of New York, and to Mr. William Edgar, Department of Justice, Civil Fraud Division by electronic service.

On March 1, 2013, Relator served a copy of his proposed, sealed Complaint, as additional disclosure materials, upon US Attorneys Preet Bharara, Pierre Armand and Daniel Filor for the United States District Court for the Southern District of New York and upon Mr. William Edgar, Department of Justice, Civil Fraud Division, by electronic service.

**Relator's Complaint**                                                                 **Page 30**

On March 1, 2013, Relator served a copy of his <u>Disclosure Statement</u> and <u>proposed, sealed Complaint</u>, as additional disclosure materials, upon US Attorney General, Eric H. Holder, Jr. via Certified Mail, Return Receipt Requested.

On this date, March 5, 2013, a copy of Relator's sealed Complaint which was served upon U.S. Attorney Preet Bharara, AUSA Pierre Armand and AUSA Daniel Filor for the U.S. Attorney's Office for the Southern District of New York and Mr. William Edgar for the Department of Justice, Civil Fraud Division by electronic service, and a copy was also served, pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon:

Eric H. Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Stephen A. Weiss